*Attorney Grievance Commission of Maryland v. Edward Emad Moawad*, AG No. 11, September Term, 2020. Opinion by Getty, J.

ATTORNEY DISCIPLINE – SANCTION – DISBARMENT

Respondent, Edward Emad Moawad, violated several provisions of the Maryland Attorneys' Rules of Professional Conduct ("MARPC") when he failed to properly file his clients' immigration forms, failed to take remedial action to correct the filing errors, failed to communicate with his clients about the status of their cases, failed to supervise non-attorney staff to ensure their conduct was compatible with his professional obligations, charged unreasonable fees for legal services never rendered or erroneously completed, and made intentional misrepresentations to Bar Counsel.

Mr. Moawad's conduct violated the following rules of professional conduct: 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 5.3 (Responsibilities Regarding Non-Attorney Assistants), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct). Disbarment is the appropriate sanction in this case.

Circuit Court for Montgomery County
Case No. 481259V
Argued: April 12, 2021

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 11

September Term, 2020

_____

ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND

V.

EDWARD EMAD MOAWAD

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

_____

Opinion by Getty, J.

_____

Filed: August 11, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Throughout the course of representing three different clients in various immigration matters, Edward Emad Moawad, Respondent, failed to deliver competent legal services, thereby prejudicing his clients, and then repeatedly failed to remediate his mistakes. Additionally, he failed to communicate with each of his three clients, forcing them to seek other counsel, and ignored multiple requests to refund unearned legal fees. When the various clients filed complaints with the Attorney Grievance Commission, Mr. Moawad declined to accept any responsibility for his actions, and instead deflected all blame to his business partner, George Adams, and other attorneys at his law firm. To further compound his misconduct, Mr. Moawad submitted a series of letters to Bar Counsel—on his own behalf, through his counsel, and, most remarkably, under the pretext of his business partner—containing many knowing and intentional misrepresentations about his involvement in the various complainants' cases. For the reasons discussed below, we shall disbar Mr. Moawad.

## BACKGROUND

### A.    *Procedural Context.*

On April 8, 2020, the Attorney Grievance Commission of Maryland, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") with the Court of Appeals, alleging that Mr. Moawad and his business partner, Mr. Adams, violated the Maryland Attorneys' Rules of Professional Conduct ("MARPC" or "Rules").

Concerning the conduct of Mr. Moawad and Mr. Adams in relation to three separate immigration clients,[1] the Petition alleged that Mr. Moawad and Mr. Adams violated the following Rules: 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 1.16 (Declining or Terminating Representation), 5.3 (Responsibilities Regarding Non-Attorney Assistants), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct).[2]

On April 13, 2020, this Court designated the Honorable Cheryl A. McCally ("hearing judge") of the Circuit Court for Montgomery County to conduct an evidentiary hearing concerning the alleged violations and to provide findings of fact and recommended conclusions of law. *See* Md. Rule 19-722(a). Mr. Moawad was personally served with process on April 28, 2020 and filed an answer to the Petition on May 13, 2020. Mr. Adams was also served and filed a separate answer on May 11, 2020.

Due to the COVID-19 pandemic, judicial operations in Maryland were restricted until the Maryland Judiciary entered Phase III of the Coronavirus Phased Reopening Plan, effective July 20, 2020. Under Phase III, circuit courts were permitted to schedule matters including attorney disciplinary proceedings. On July 27, 2020, the parties in this case

---

[1] Originally, four clients filed complaints, but the Attorney Grievance Commission withdrew all charges related to one of the complainants, Melissa Arriaza, at the outset of the evidentiary hearing.

[2] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct and recodified in Title 19 of the Maryland Rules. Because part of Mr. Moawad's misconduct occurred before the effective date of the recodification of the rules of professional conduct, he committed violations of the same rules of professional conduct under both the MLRPC and the MARPC. Because there is no substantive difference in the two codifications of the rules, we will use the shorter designations of the MLRPC, e.g., "Rule 1.1."

participated in a remote scheduling conference, and a hearing was scheduled to be held from December 18, 2020 through December 23, 2020.

The Co-Respondent in the case, Mr. Adams, was indefinitely suspended from the practice of law in Maryland as a result of a Joint Petition for Indefinite Suspension by Consent filed by Bar Counsel on September 17, 2020. The matter then proceeded solely against Mr. Moawad.

On December 1, 2020, the hearing judge held a remote status conference, during which Mr. Moawad's counsel made an oral motion to continue the hearing, premised on his objection to the court's plan to conduct the hearing virtually. Mr. Moawad argued that a virtual hearing would deprive him of due process and the ability to adequately confront the witnesses, while also hindering the court's ability to assess witness credibility. The hearing judge issued findings of fact allowing Mr. Moawad to present his opposition to the virtual hearing in a written motion to continue, which was filed in the Court of Appeals on December 3, 2020. This Court denied Mr. Moawad's motion by an Order dated December 9, 2020.

The evidentiary hearing spanned four days: December 18, 21, 22, and 23, 2020. Following the hearing, the hearing judge submitted her findings of fact and conclusions of law by a written opinion to this Court. In her recommended conclusions of law, the hearing judge found by clear and convincing evidence that Mr. Moawad violated Rule 1.1, Rule 1.3, Rule 1.4, Rule 1.5, Rule 5.3, Rule 8.1, and Rule 8.4.[3]

---

[3] The Rule 1.16 violation (Declining or Terminating Representation) alleged in the Petition was withdrawn by the Attorney Grievance Commission.

3

On March 10, 2021, Mr. Moawad filed extensive exceptions to the hearing judge's findings of fact and recommended conclusions of law in this Court. Bar Counsel filed no exceptions but responded to Mr. Moawad's exceptions on March 25, 2021. We heard oral arguments on this matter on April 12, 2021.

## B.    *Factual Findings.*

We begin by summarizing the hearing judge's factual findings. Mr. Moawad was admitted to the Maryland Bar on July 20, 2015. He was previously admitted to the Virginia State Bar in October 2009 and the District of Columbia Bar in January 2011.[4]

On July 15, 2014, Mr. Moawad established a law practice located in Chevy Chase, Maryland, under the firm name of Adams, Burton & Moawad ("the ABM firm" or "ABM"). The other named principals of the firm were George Adams and William Burton. In addition to the firm's office in Chevy Chase, the firm also maintained an office at Mr. Moawad's home in McLean, Virginia.

The ABM firm was formed with a division of responsibilities whereby Mr. Adams "would handle the high net worth clients, Mr. Burton would handle the civil cases, and Mr. Moawad would do the immigration work." However, as the business progressed, much of the firm's practice was in the field of immigration law. Thus, Mr. Adams started doing

---

[4] Although not part of the hearing judge's findings of facts, Bar Counsel noted in their later response to Mr. Moawad's exceptions that Mr. Moawad was previously subjected to a temporary administrative suspension from the Virginia Bar in 2019 for failure to comply with a subpoena. After complying with the subpoena, the suspension was lifted. Additionally, Mr. Moawad was temporarily suspended from the District of Columbia Bar pending final disposition of the Virginia disciplinary matter. No further action has been taken, and Mr. Moawad remains suspended from the District of Columbia Bar.

immigration work "under the tutelage of Mr. Moawad" who primarily practiced immigration law. In addition, Mr. Moawad's title was "managing director" of the firm and he handled all the financial matters, including approval of legal fees assessed by the firm and the management of the firm's attorney trust account.

Around February 1, 2016,[5] Mr. Adams left the ABM firm and intended to retire from the practice of law. However, in December 2016, Mr. Adams returned to the ABM firm to work as an independent contractor. This arrangement continued until the end of 2017. In January 2018, Mr. Moawad and Mr. Burton established a new practice under the firm name of Moawad & Burton, P.C, which was operated out of the ABM firm's office space. In addition, Mr. Adams established his own solo practice at the same location under the firm name of Adams Law Firm, P.C.

In addition to making factual findings regarding Mr. Moawad's misconduct alleged in each of the three complaints, the hearing judge made factual findings regarding various letters Mr. Moawad sent to Bar Counsel in response to the three complaints. We will review the facts regarding the representation of each of the complainants as well as Mr. Moawad's letter responses to Bar Counsel separately below.

*1.     Mr. Moawad's Representation of Mr. Madio Kossi Togbetse.*

Madio Kossi Togbetse is an immigrant from Togo who originally came to the United States in January 2005 as a twenty-four-year-old refugee seeking to continue his education. He entered the country on an F-1 student visa and then applied for asylum. The

---

[5] The exact date of Mr. Adams' initial retirement is unclear.

asylum application went before the Executive Office for Immigration Review ("EOIR") and was assigned to an immigration judge for trial. Mr. Togbetse's attorney at that time withdrew his application for asylum before the conclusion of the trial, causing Mr. Togbetse to be placed in a removal proceeding within the jurisdiction of EOIR. Mr. Togbetse's prior attorney applied on Mr. Togbetse's behalf for withholding of removal, which was granted on May 8, 2006. After this, Mr. Togbetse remained in the United States and obtained annual renewal of work permits to maintain employment. In 2013, he married his wife, Heather Togbetse, who is an American citizen.

In 2014, Mr. Togbetse conducted an online search for an immigration attorney and located Mr. Moawad. On July 2, 2014, Mr. and Ms. Togbetse met with Mr. Moawad at his office in Chevy Chase to discuss Mr. Togbetse's goal of obtaining permanent resident status in the United States. At the meeting, Mr. Togbetse explained to Mr. Moawad the history of his withdrawn asylum application and showed him a letter from the Immigration Court confirming that he had been granted withholding of removal in May 2006. Mr. Moawad told Mr. Togbetse that they would need to file a Freedom of Information Act ("FOIA") request to obtain Mr. Togbetse's entire immigration file.

Mr. Togbetse agreed to hire Mr. Moawad for that purpose and signed an engagement letter printed on the letterhead of Moawad, P.C., Mr. Moawad's solo law practice which existed prior to the ABM firm. This letter specified the services to be provided as "U.S.C.I.S FOIA Request only" and contained a signature block that identified Mr. Moawad as "president" of Moawad, P.C. Mr. Moawad did not sign the document. The agreement provided that the firm would file Mr. Togbetse's FOIA request for a fee of $500,

6

which Mr. Togbetse paid. Subsequently, Mr. Togbetse received an electronic copy of his immigration record on a compact disk ("CD") from the United States Citizenship and Immigration Services ("USCIS") in response to the FOIA request. Mr. Togbetse made a duplicate copy of the CD for himself and mailed the original to Mr. Moawad, with delivery confirmed by tracking through the U.S. Postal Service.

Sometime in the fall of 2014, Mr. and Ms. Togbetse went to Mr. Moawad's office in McLean for a scheduled appointment with Mr. Moawad. Mr. Moawad was not present, and instead they met with a paralegal named "Margarita." Mr. and Ms. Togbetse provided Margarita with additional documents requested earlier by Mr. Moawad. During this appointment, Mr. Togbetse realized that Mr. Moawad had lost the CD containing his immigration record.

Following the meeting with Margarita, Mr. and Ms. Togbetse scheduled another appointment with Mr. Moawad on December 1, 2014 at the Chevy Chase office. At this appointment, Mr. Togbetse provided Mr. Moawad with a replacement CD containing the documents from the FOIA request. Mr. Moawad reviewed all the information and they discussed how to proceed with the case. Mr. Moawad presented Mr. Togbetse with a second engagement letter, also printed on the letterhead of Moawad, P.C., with the signature block identifying Mr. Moawad as the "managing member" of the firm. Mr. Togbetse signed the December 1, 2014 engagement letter, which indicated that Mr. Moawad would provide the following services:

> Petition for Spouse of U.S. Citizen (I-130) and adjustment of status (I-485) only; interview included; client has been granted stay by the I[mmigration]

7

J[udge] and he understands the implication of his status and agreed to proceed accordingly.

At the time the second engagement letter was drafted and signed, Mr. Moawad had direct knowledge that an immigration judge had granted Mr. Togbetse a withholding of removal in 2006. Mr. Moawad was the only attorney present at the December 1 meeting, and Mr. Togbetse was unaware of the existence of the ABM firm because the agreement was still with Mr. Moawad's solo law practice of Moawad, P.C. Moreover, the second engagement letter provided for payment of an initial "nonrefundable retainer" of $1,000 to be followed by an additional $2,500 in legal fees payable within four months. Mr. Togbetse gave Mr. Moawad a check for $1,000 and five additional post-dated checks of $500 each. Mr. Moawad and/or someone associated with the ABM firm deposited each of the post-dated checks and retained the proceeds, totaling $2,500, in addition to the $1,000 nonrefundable retainer. Additionally, Mr. Togbetse wrote a check totaling $1,070 for fees and gave it to Mr. Moawad's office to be submitted with his immigration filings.

Following the meeting, a Form I-130 (Petition for Alien Relative)[6] was filed on behalf of Mr. Togbetse and approved by USCIS. Likewise, Mr. Togbetse's I-485 (Application to Register Permanent Residence or Adjust Status)[7] was filed and received by

---

[6] A USCIS Form I-130 is a Petition for Alien Relative that can be filed by a citizen or lawful permanent resident of the United States to establish his or her relationship to an eligible relative, including a spouse, who wishes to immigrate or remain in the United States permanently. *I-130, Petition for Alien Relative*, U.S. Citizenship and Immigration Services (May 4, 2021), https://www.uscis.gov/i-130 [https://perma.cc/L7D3-7TN9].

[7] A USCIS Form I-485 is an Application to Register Permanent Residence or Adjust Status that is used by a person in the United States to apply for lawful permanent resident status. *Instructions for Application to Register Permanent Residence or Adjust Status,* U.S.

8

USCIS on March 2, 2015, which was confirmed when Mr. Togbetse received a Form I-797C (Notice of Action) from USCIS.

After the I-485 application was filed, Mr. Togbetse received a Form I-797C (Notice of Action) dated August 5, 2015, directing him to appear for an interview in connection with his I-485 application on September 8, 2015 at the USCIS field office in Baltimore. Upon receipt of the notice, Mr. Togbetse contacted Mr. Moawad, who responded by informing Mr. Togbetse that Mr. Adams would accompany him to the interview. Mr. Adams had not been involved in representing Mr. Togbetse prior to this point. Mr. Togbetse testified that he was "very disappointed" because he expected that Mr. Moawad would go with him. Mr. Togbetse met with Mr. Adams the day prior to the interview and, the next day, they both attended the interview.

Several months after the interview, Mr. Togbetse became concerned because he had not received any additional information regarding his application. Mr. Togbetse attempted to contact Mr. Moawad but received no response. In April 2016, Mr. Togbetse received a "Request for Evidence" from USCIS related to his I-485 application. The request was for Mr. Togbetse to provide an updated Form I-693 (Report of Medical Examination and Vaccination Record). After completing a medical examination and receiving the necessary vaccinations, Mr. Togbetse submitted the Form I-693 on his own without any assistance from Mr. Moawad or the ABM firm. Before the hearing judge, Mr. Togbetse testified that,

---

Citizenship and Immigration Services, 2 (2021), https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf [https://perma.cc/458U-QE96].

due to the inaction by Mr. Moawad or the ABM firm, he had to get the same required vaccinations three times, paying $450 to $500 each time.

On June 11, 2016, Mr. and Ms. Togbetse scheduled an InfoPass appointment[8] at the USCIS field office in Baltimore to get an update on Mr. Togbetse's immigration status because Mr. Moawad had not responded to various requests for updates. About two weeks after the InfoPass appointment, Mr. Togbetse received a notice of administrative closure, dated June 22, 2016, from USCIS, which indicated that Mr. Togbetse's I-485 application was being closed "because USCIS does not have jurisdiction to adjudicate your Form I-485." The notice explained that as a respondent in a removal proceeding "only EOIR has jurisdiction to grant or deny your Form I-485" and that Mr. Togbetse needed to "move EOIR to reopen the proceedings in order for [him] to apply for adjustment of status."

After receiving the June 22, 2016 notice, Mr. Togbetse again tried to contact Mr. Moawad but was unsuccessful. Mr. Togbetse spoke to a paralegal who set up an appointment for Mr. Togbetse at the Chevy Chase office for late July 2016. At this meeting, Mr. Togbetse met with Mr. Moawad and Mr. Burton, as well as someone he believed to be an intern. At this meeting, Mr. Moawad agreed to provide additional legal services based on USCIS's closure of the case. Specifically, Mr. Moawad agreed to file a motion to reopen Mr. Togbetse's removal proceeding before EOIR for no additional legal

---

[8] "InfoPass is a free online service that lets you schedule an appointment with a[n] . . . USCIS . . . immigration officer. You can go online at any time to schedule your appointment instead of requesting it in person at your local USCIS office." *Fact Sheet: Your Guide to InfoPass*, U.S. Citizenship and Immigration Services (March 3, 2017), https://www.uscis.gov/sites/default/files/document/fact-sheets/info-pass-fact-sheet.pdf [https://perma.cc/3UEH-RKFL].

fee.  An engagement letter addendum dated August 2, 2016, which memorialized this agreement and identified Mr. Moawad as managing director of the ABM firm, was sent to Mr. Togbetse by mail.  Mr. Togbetse signed the agreement on August 9, 2016 and returned it to Mr. Moawad's office.

After this agreement, Mr. Moawad failed to take any action on behalf of Mr. Togbetse.  Mr. Togbetse repeatedly communicated with various ABM firm staff members who would, according to Mr. Togbetse, "quit and leave" their employment at ABM after Mr. Togbetse spoke with them.  In early 2017, Mr. Togbetse terminated Mr. Moawad as his attorney, indicating that he felt Mr. Moawad's representation sent him in "the wrong direction" of obtaining lawful permanent resident status.  Following the termination of the attorney-client relationship, Ms. Togbetse filed a complaint with the Attorney Grievance Commission against Mr. Moawad on behalf of herself and her husband.

The hearing judge determined that Mr. Moawad met personally with Mr. Togbetse on July 2, 2014 and again on December 1, 2014 and agreed to provide legal services described in the two engagement letters signed by Mr. Togbetse on those respective dates. Fee arrangements were made and honored by Mr. Togbetse based on the engagement letters.  The hearing judge found that, although Mr. Moawad may have delegated work to staff in his law firm, he remained Mr. Togbetse's attorney and cannot disclaim responsibility for the representation he agreed to undertake.  Additionally, Mr. Moawad agreed to provide the remedial legal service of filing a motion to reopen Mr. Togbetse's removal proceeding for no charge in order to rectify the mistake Mr. Moawad's firm made

11

in filing Mr. Togbetse's I-485 application improperly with USCIS. Moreover, the hearing judge found that Mr. Moawad later reneged on that agreement.

2. *Mr. Moawad's Representation of Dr. Jing Hao.*

Dr. Jing Hao is a medical researcher who holds a doctorate degree in medicine and a master's degree in radiation research obtained in her native country of China. Dr. Hao came to the United States in 2003 to pursue a Ph.D. at Rutgers University in New Jersey. She received her Ph.D. in 2009, after which she remained in the United States working as a medical researcher. During the summer of 2015, Dr. Hao was employed at The George Washington University in Washington, D.C. She was on a non-immigrant H-1B visa performing services in a specialty occupation and was interested in applying for an immigration visa that would allow her to obtain permanent residency and pursue a different occupation. Mindful of the time constraints and other H-1B limitations, Dr. Hao conducted an online search for a local immigration attorney and found Mr. Moawad.

Dr. Hao set up an appointment to meet with Mr. Moawad on a Saturday in late June or early July 2015 at his Chevy Chase office. Mr. Moawad failed to attend the meeting. Dr. Hao waited for two hours, after which Mr. Adams met with her to apologize for Mr. Moawad's absence. At this time, Dr. Hao did not communicate with Mr. Adams about her immigration status nor did she retain the firm.

However, Dr. Hao scheduled another appointment with Mr. Moawad and was able to meet with him at the Chevy Chase office on a Saturday later in July 2015. They discussed Dr. Hao's situation, including her academic achievements and employment situation. During the course of the appointment, Dr. Hao sought Mr. Moawad's legal

12

advice regarding the best strategy to change her immigration status and agreed to hire Mr. Moawad as her attorney. Mr. Moawad generated an engagement letter dated July 18, 2015, which was printed on the letterhead of the ABM firm, with a typed signature block identifying Mr. Moawad as managing director. Dr. Hao signed the agreement on July 18, 2015. The engagement letter identified the legal services to be provided as: an "Application for Employment-Based Immigration: First Preference (EB-1-self-petition) & NIW" and provided for payment of $7,000 in legal fees. Dr. Hao agreed to pay the full amount upfront to obtain a $500 discount and paid by credit card on the same day.

Mr. Moawad agreed to pursue the dual immigration strategy of applying on behalf of Dr. Hao for an EB-1A immigration visa as an alien of extraordinary ability pursuant to section 203(b)(1)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1153(b)(1)(A) as her first preference and a national interest waiver ("NIW") employment-based visa pursuant to section 203(b)(2) of the INA, 8 U.S.C. § 1153(b)(2) as her second preference. Both approaches required filing a Form I-140 (Immigrant Petition for Alien Worker).[9] Dr. Hao also wished to obtain lawful permanent resident status through employment in one of the preference categories, which required filing a Form I-485 (Application to Register Permanent Residence or Adjust Status).

---

[9] A Form I-140 is an Immigrant Petition for Alien Worker that is used to ask USCIS to classify an alien as someone who is eligible for an immigrant visa based on employment. The employer generally files the Form I-140 for the alien. *Petition Filing and Processing Procedures for Form I-140, Immigrant Petition for Alien Worker*, U.S. Citizenship and Immigration Services (Oct. 16, 2019), https://www.uscis.gov/forms/all-forms/petition-filing-and-processing-procedures-for-form-i-140-immigrant-petition-for-alien-worker [https://perma.cc/659S-G5EN].

On December 11, 2015, Dr. Hao met with a law student working for Mr. Moawad at his Chevy Chase office. At that meeting, she signed several documents presented to her for her signature. Mr. Moawad was not present at the meeting. Dr. Hao understood that the documents she signed were to be filed with "the immigration office," consistent with the services Mr. Moawad had agreed to provide. Dr. Hao was not supplied with copies of any of the documents she signed.

Sometime after the December 11 meeting, Dr. Hao went to the ABM firm's McLean office to provide checks needed for fees associated with her USCIS filings and to sign additional documents. All the documents signed by Dr. Hao were blank forms, and she never received copies of the completed documents despite multiple requests. Dr. Hao eventually received two Form I-797C notices of action dated February 10, 2016, confirming USCIS's receipt of an I-140 petition and an I-485 application filed on her behalf. However, both of the notices referred to the preference classification of the filing as "203 B1B PROF-RESEARCHER."

Dr. Hao's NIW I-140 filing was approved in 2016 on first submission, but her focus remained on obtaining approval of EB-1A first preference status and lawful permanent resident status. During one phone conversation with Mr. Moawad, he "assured [Dr. Hao] that [her] qualification [was] really extraordinary for this immigration application."

In April 2016, Dr. Hao moved to Cleveland to accept a position with the Cleveland Clinic. After relocating, Dr. Hao learned that her father in China had been diagnosed with cancer. On her own, she filed USCIS Form I-131 (Application for Travel Document) in July 2016, and obtained an advanced parole document, allowing her to return to the United

14

States after temporary foreign travel. Dr. Hao traveled to China in October 2016 to see her father and again in April 2017 to attend his funeral.

During Dr. Hao's time in China for the funeral, a colleague who was monitoring mail in Cleveland sent her an image of a "decision" letter dated April 12, 2017, informing Dr. Hao that the I-140 petition filed on her behalf by Mr. Moawad's office had been denied. The decision letter explained that the self-filed petition sought "to classify the beneficiary [Dr. Hao] as an outstanding professor or researcher in accordance with Section 203(b)(1)(B) of the Immigration and Nationality Act (INA) as a postdoctoral scientist." Because "the beneficiary (not a United States employer) . . . filed Form I-140," USCIS determined that Dr. Hao was not eligible to file Form I-140 under section 203(b)(1)(B) of the INA. Dr. Hao also received a "notice of intent to deny" her I-485 application, dated April 20, 2017, from USCIS. The notice informed Dr. Hao that because USCIS denied her I-140 petition, she would not be the beneficiary of an approved immigrant visa petition that would allow the adjustment of her status to that of alien lawfully admitted for permanent residence in the United States.

Following the receipt of these documents, Dr. Hao contacted Mr. Moawad for advice about how to proceed. She was concerned that the denial would cause issues with her employment and with her travel back to the United States. Mr. Moawad was not helpful and provided no advice or information to assist Dr. Hao. Dr. Hao was able to return to Cleveland and spoke with a representative in the human resources department at the Cleveland Clinic. Dr. Hao provided the human resources representative with Mr.

Moawad's name as a contact because he was her "immigration lawyer at that time, as far as [Dr. Hao was] concerned."

Dr. Hao attempted to reach Mr. Moawad by phone for several months without success and eventually sent him a detailed email on October 3, 2017. Although she copied Mr. Adams on the email, based on her belief that Mr. Adams was Mr. Moawad's partner, she did not consider Mr. Adams to be her attorney. In the email, Dr. Hao expressed dissatisfaction with Mr. Moawad's mistaken filing of "an EB-1B petition instead of EB-1A as indicated in the contract" and that the "mistake cost me both money and over a year in anxious waiting and confusion." Dr. Hao requested a refund of half of the legal fee ($3,500), plus the filing fee paid for the erroneously filed petition. Mr. Moawad did not reply to the email or otherwise respond in any manner.

In the period between October 3 and November 7, 2017, Dr. Hao had contact with Mr. Adams. Dr. Hao sent another email to Mr. Moawad and Mr. Adams on November 7, 2017, referencing her contact with Mr. Adams. Having received no response by November 14, 2017, Dr. Hao sent Mr. Moawad another email, expressing her belief that he was "abandoning [her] case" and stating that she was discharging Mr. Moawad and his firm as her legal counsel. Within the email, Dr. Hao requested that her files be sent to her and that the previously requested refund be issued. On November 14, 2017, Mr. Moawad sent Dr. Hao a one-line reply stating, "[k]indly address all your inquiries directly to your attorney Mr. George Adams." Dr. Hao was "surprised" by Mr. Moawad's response because she "never thought" that Mr. Adams was her attorney.

16

Dr. Hao did not receive any monetary refund from Mr. Moawad and had no further communication with him after the email on November 14, 2017. Mr. Adams assisted her by filing an EB-1A petition at no charge, which was granted in 2018 and Dr. Hao successfully obtained lawful permanent resident status in August 2020. Following her email termination of Mr. Moawad on November 14, 2017, Dr. Hao filed a complaint against him with the Attorney Grievance Commission.

Based upon these facts, the hearing judge found by clear and convincing evidence that Mr. Moawad was always Dr. Hao's immigration attorney from July 18, 2015 through November 14, 2017, and that Mr. Adams did not serve as Dr. Hao's attorney prior to that date. Additionally, the hearing judge found that Mr. Moawad was engaged by Dr. Hao to file an employment-based, first preference I-140 petition on her behalf in the EB-1A category as an alien of extraordinary ability. Mr. Moawad, or non-attorney staff working under his supervision, erroneously filed Dr. Hao's I-140 petition under section 203(b)(1)(B) of the INA, seeking to qualify her for an EB-1B visa as an outstanding professor or researcher. Because a petition in the EB-1B category must be filed by a U.S. employer, Mr. Moawad's error caused USCIS to deny the petition.

> 3. *Mr. Moawad's Representation of Ms. Joy Liang and Mr. Juan Carlos Machado.*

Joy Liang, an American citizen, is the wife of Juan Carlos Machado, an immigrant from El Salvador. In 2016, Mr. Machado wished to obtain permanent resident status in the United States. Mr. Machado and Ms. Liang conducted an online search for an immigration attorney and located the ABM firm. On August 27, 2016, Ms. Liang and Mr. Machado

17

traveled to the ABM firm's Chevy Chase office and met with a non-attorney staff member. None of the attorneys from the ABM firm were present at the meeting. During the meeting, Ms. Liang and Mr. Machado were presented with an engagement letter, dated August 27, 2016, and printed on the ABM firm letterhead. The letter included a typed signature block identifying Mr. Moawad as the managing director of the firm. Mr. Machado signed the August 27 engagement letter at the meeting. The agreement identified that the services to be provided were an "I-130 Petition for Alien Relative" and "601" (Application for Provisional Unlawful Presence Waiver).[10]

The engagement letter provided for an initial payment of $400 on August 27, 2016, and $400 payments on the 27th day of each month thereafter, until the balance of $7,000 was paid in full. Between the signing of the engagement letter in August 2016 and December 2017, Ms. Liang paid attorney's fees in the amount of $6,900 to the ABM firm. In addition to attorney's fees, Ms. Liang also paid the USCIS filing fees in the amount of $420 for the I-130 petition and $715 for the I-601A application.

Following the signing of the engagement letter, a Form I-130 was filed on behalf of Ms. Liang, as confirmed by an I-797C notice dated October 13, 2016. A copy of the I-130 petition was mailed to Ms. Liang, in the care of Saba Rashid, an attorney at the ABM firm.

_____

[10] A USCIS Form I-601A is an Application for Provisional Unlawful Presence Waiver that can be used by certain immigrant visa applicants who are relatives of U.S. citizens or lawful permanent residents. This application is used to request a provisional waiver of the unlawful presence grounds of inadmissibility under section 212 (a)(9)(B) of the INA before departing the United States to appear at a U.S. Embassy or Consulate for an immigrant visa interview. *I-601A, Application for Provisional Unlawful Presence Waiver*, U.S. Citizenship and Immigration Services (May 4, 2021), https://www.uscis.gov/i-601a [https://perma.cc/487H-4U3W].

The I-130 petition was approved by USCIS on February 7, 2017, which was confirmed by a letter to Ms. Rashid from the United States Department of State National Visa Center, dated March 30, 2017, containing the approval notice. Although Ms. Rashid's name appeared on the documentation related to the I-130 petition from USCIS and the United States Department of State National Visa Center, Ms. Liang and Mr. Machado never met or spoke with Ms. Rashid or any other attorney at the ABM firm.

In May 2017, Ms. Liang provided supporting documents for the I-601A application to Yugaris Carrasquel, a non-attorney staff member at the ABM firm. In addition to this communication with Ms. Carrasquel, Ms. Liang also communicated with another staff member at the ABM firm, identified as a law clerk who worked closely with Mr. Moawad, to prepare a brief in support of the I-601A application.

On August 21, 2017, USCIS received the Form I-601A filed on behalf of Mr. Machado, and on August 22, 2017, USCIS issued a rejection notice to Mr. Machado, in the care of Mr. Adams. The rejection notice stated that the application was rejected "because the Fee Receipt provided by the Department of State is missing from your application." Although this rejection notice had Mr. Adams' name on it, Ms. Liang and Mr. Machado had never met or spoken with him concerning their case.

On September 25, 2017, USCIS received a second Form I-601A application filed on behalf of Mr. Machado, and on September 26, 2017, USCIS issued a second rejection notice to Mr. Machado, stating again that the application was rejected because "the Fee Receipt provided by the Department of State is missing from your application."

After receiving each rejection notice, Ms. Liang contacted Ms. Carrasquel to discuss what needed to take place to ensure the filings were accepted. Ms. Liang contacted Ms. Carrasquel instead of an attorney at the ABM firm because Ms. Liang did not work with or speak to an attorney at any time during the representation. On multiple occasions, Ms. Liang requested that Ms. Carrasquel send her an accounting of the fees she paid to the ABM firm and also asked that her bill be reduced to reflect the two rejected applications. Ms. Liang was directed to contact Mr. Moawad and was given his email address. Ms. Liang then emailed Mr. Moawad directly, but he failed to respond. Ultimately, Ms. Liang never received the requested accounting of the fees she paid to the ABM firm.

On October 10, 2017, another I-601A application was filed on behalf of Mr. Machado, as confirmed by an I-797C notice mailed to Mr. Machado on October 17, 2017, which informed Mr. Machado the application had been received by USCIS and was in process. Because Ms. Liang and Mr. Machado had never spoken to an attorney at the ABM firm and were not provided with adequate explanation or guidance for the process to secure permanent residency, Ms. Liang and Mr. Machado conducted online research to determine what they should do upon approval or denial of the application.

Ms. Liang continued to request an accounting of the fees that she paid to the ABM firm, but her requests were ignored. She made these requests due to her dissatisfaction with the ABM firm's legal representation and a desire to keep track of the total amount of payments made to the firm. Ms. Liang testified that "the process was rushed [and] . . . somewhat careless due to the rejections and also in the process of working with an intern" and that the "firm was not professional and . . . did not provide us with information as

20

clients that would help us in the process[.]" Ms. Liang filed a complaint with the Office of the Attorney General, Consumer Protection Division, which was forwarded to the Attorney Grievance Commission.

During the evidentiary hearing, Mr. Adams testified that Mr. Moawad practiced immigration law at the time the ABM firm was formed and was the only partner with a background in immigration law. Therefore, when an issue arose in an immigration matter, Mr. Moawad was "the principal source of information and expertise." Additionally, Mr. Adams testified that it was Mr. Moawad who served as the ABM firm "business manager," and thus "handled all the financial matters."

The hearing judge found that the ABM firm failed to provide competent legal representation to Ms. Liang and Mr. Machado after being paid legal fees to perform services set forth in the August 27, 2016 engagement letter. Additionally, the hearing judge found that Mr. Moawad failed to supervise the non-attorney staff handling the legal representation of Ms. Liang and Mr. Machado, and that Mr. Moawad had an obligation to timely respond to Ms. Liang's requested accounting and reduction of her fee and failed to do so.

4. *Mr. Moawad's Misrepresentations to Bar Counsel Regarding the Attorney Grievance Complaints.*

After Ms. Togbetse, Dr. Hao, and Ms. Liang filed complaints, Bar Counsel contacted Mr. Moawad for a response. Mr. Moawad submitted an initial written response regarding the Togbetse matter on April 12, 2017.

21

The hearing judge found that there was clear and convincing evidence that Mr. Moawad made several false and misleading material statements in his April 12, 2017 letter responding to Ms. Togbetse's complaint. Within the letter, Mr. Moawad wrote that it was Mr. Adams who signed the engagement letter with the Togbetses, that it was Mr. Adams who "handled all the immigration work in [the] firm," and that Mr. Adams "expended a great deal of hours and without compensation helping Mr. and Ms. Togbetse." The hearing judge found each of these statements to be false, as the two engagement letters signed by Mr. Togbetse were for representation by Moawad, P.C. and contained signature blocks identifying Mr. Moawad as the attorney entering into the agreements. Neither agreement mentioned Mr. Adams. Additionally, Mr. Togbetse's testimony further established that he and his wife met with Mr. Moawad and hired him to be their attorney. Moreover, the only involvement Mr. Adams had in representing Mr. Togbetse occurred when he met with Mr. Togbetse on September 7, 2015 and attended his I-485 interview the following day.

In addition, the hearing judge found that Mr. Moawad's April 12, 2017 letter also misrepresented that "Mr. George Adams has done exceptional work in his representation of Mr. and Ms. Togbetse and the complaints I have heard about his work for them were unfounded and intended to merely avoid paying justly for legal work rendered." The hearing judge pointed to substantial evidence in both Mr. Togbetse and Mr. Adams' testimony that corroborated that Mr. Adams was not the attorney representing Mr. Togbetse and had a very limited role in the ABM firm's representation.

Further, the hearing judge found that the Togbetses fully complied in making all payments required in both engagement letters and were not simply trying to avoid payment

for services. The hearing judge found that it was Mr. Moawad, instead of Mr. and Ms. Togbetse, who failed to honor the terms of the engagement letter addendum dated August 2, 2016, in which Mr. Moawad agreed to provide additional services at no charge. Mr. Moawad further misrepresented that the firm "ha[d] forgiven [its] fees due it from Mr. and [Ms.] Togbetse on several occasions in the past" and that the firm had "offered a considerably reduced fee for additional work[.]" The hearing court found that, in reality, no fees were forgiven and Mr. Moawad had agreed to provide additional services for no legal fee, not a reduced fee, in order to rectify the mistake his firm made in filing Mr. Togbetse's I-485 application with USCIS.

Along with the misrepresentations in Mr. Moawad's April 12, 2017 letter, Mr. Moawad also submitted an attached letter purportedly from Mr. Adams, which Mr. Moawad drafted and asked Mr. Adams to sign. Mr. Adams testified that he agreed to sign the letter because Mr. Moawad "was the business manager for the firm, and that was a letter that he suggested I sign and that's what I did." The hearing judge found Mr. Adams' testimony credible because the hearing judge found that Mr. Adams was very deferential to and trusting of Mr. Moawad while they worked together. Although not absolving Mr. Adams of responsibility for signing a letter containing false information, the hearing court found that Mr. Moawad knowingly prepared the letter for Mr. Adams to sign, fully aware that the letter contained false information about the Togbetse representation.

Additionally, the letter signed by Mr. Adams contained false information about the extent of Mr. Adams' involvement in the firm's representation of Mr. Togbetse. In the opening sentence, the letter falsely stated, "I first met Mr. Togbetse on or about December

23

1, 2014." At another point, the letter stated that the law firm "responded at no additional charge" to the April 27, 2016 request for evidence when, in reality, Mr. Togbetse personally provided a response to the request. Furthermore, the letter falsely stated that after the USCIS administrative closure of Mr. Togbetse's I-485 application, the firm "did not hear from Mr. Togbetse for months" and "when [the firm] did hear from Mr. Togbetse the firm agreed to a fee of $2,500[.]" Furthermore, the letter falsely suggested that the I-485 application was incorrectly filed with USCIS because "Mr. Togbetse had misrepresented the fact that he was in removal proceedings." However, Mr. Togbetse made no such misrepresentation and instead provided Mr. Moawad with detailed accurate information regarding his immigration history.

In addition to Mr. Moawad's misrepresentations in the April 12, 2017 letters, Mr. Moawad conveyed false statements to Bar Counsel through his attorney, Billy B. Ruhling II, Esquire. In a letter dated January 30, 2018, Mr. Ruhling entered his appearance as Mr. Moawad's counsel in addition to indicating that he was also writing "to highlight the fact that Mr. Moawad was not Mr. Togbetse's counsel." Within the same letter, Mr. Ruhling made other false statements on behalf of Mr. Moawad to Bar Counsel, including that "Mr. Moawad . . . was not representing Mr. Togbetse, and a failure to return a non-client's phone calls is not a basis for an ethics grievance," that "Mr. Moawad never provided legal services to Mr. Togbetse," that "Mr. Moawad does not practice immigration law except for working with the firm's EB-5 visa clients in a very general way," and that Mr. Moawad "did not generate the engagement agreement nor was he aware that his name was being applied to it."

24

Moreover, Mr. Ruhling submitted two letters to Bar Counsel pertaining to Dr. Hao's case. One of the letters, dated February 22, 2018, was sent on behalf of Mr. Moawad and the other letter, dated January 11, 2018, was purported to be from Mr. Adams. The hearing judge found by clear and convincing evidence that through these two letters, Mr. Moawad made several false and misleading material statements to Bar Counsel regarding the representation of Dr. Hao. Like the letters in response to the Togbetse complaint, Mr. Moawad made similar statements that "[he] was not the attorney responsible for Ms. Hao's case[,]" that "George Adams, Esq., was the attorney . . . handling Ms. Hao's case[,]" that Mr. Moawad did not have "personal knowledge of all the measures taken on [Dr. Hao's] behalf throughout the two and a half years of Mr. Adams' representation[,]" and that Mr. Moawad had only "met briefly" with Dr. Hao at her initial consultation on July 15, 2015 and then "introduced her" to Mr. Adams "to discuss her case in greater detail." The hearing judge found Dr. Hao's testimony that she met solely with Mr. Moawad to discuss her immigration issue at the July 15, 2015 meeting to be credible. Therefore, the hearing judge found that Mr. Moawad's letter to the contrary was knowingly false.

Other false and misleading statements contained in Mr. Moawad's response to Dr. Hao's complaint included: "[a]t the time [Mr. Moawad] presented the engagement agreement to Ms. Hao, [he] re-emphasized that Mr. Adams would be her attorney, which she acknowledged. It was further [Mr. Moawad's] understanding that she already knew this, as she had done her initial consultation with Mr. Adams." Additionally, within the response, Mr. Moawad made the statement that "Mr. Adams, assisted by his staff, proceeded with the two petitions for Ms. Hao. Mr. Adams and his staff corresponded with

25

the client primarily[,]" and that Mr. Moawad "was not involved in the preparation or filing" of Dr. Hao's EB-1 petition that was incorrectly filed under the wrong classification. The hearing judge found that, in essence, Mr. Moawad deflected all responsibility to Mr. Adams while falsely and repeatedly denying that he was Dr. Hao's attorney.

Similar to his earlier testimony pertaining to the Togbetse complaint, Mr. Adams testified that the January 11 letter was prepared by Mr. Moawad for Mr. Adams' signature. Mr. Adams acknowledged that he was given an opportunity to review the letter before signing it but testified that he signed the letter because Mr. Moawad "was the business manager for the firm" and Mr. Adams "trusted him." Later, Mr. Adams recanted the letter because it contained inaccuracies about his involvement in Dr. Hao's representation. The hearing judge found Mr. Adams' testimony credible.

In addition to the false claims pertaining to Mr. Adams' representation of Dr. Hao, the hearing judge found that the January 11 letter contained further false statements, including that Mr. Adams, "agreed to apply for advance parole on behalf of Ms. Hao at no additional charge" when she traveled to China in March 2017, and that Mr. Adams "helped Ms. Hao maintain her H1-B nonimmigrant visa, so that she could keep her position . . . at the Cleveland Clinic" after she returned to the United States. Moreover, the hearing judge found that the letter falsely claimed that USCIS had made a "mistake" and a "clerical error" in denying Dr. Hao's "EB-1A petition[,]" when in fact the I-140 petition had been incorrectly drafted and filed by the ABM firm as an EB-1B petition. The hearing judge found that Mr. Moawad knew the information contained in the letter to be false because,

26

he—not Mr. Adams—was the attorney who represented Dr. Hao at all times until November 14, 2017.

Also similar to the Togbetse and Hao matters, Mr. Moawad submitted an initial written response through his counsel to Bar Counsel regarding Ms. Liang's complaint on February 5, 2018, in which Mr. Moawad indicated that he "was not Ms. Liang's counsel," and that he "never provided legal services to Ms. Liang." Mr. Moawad again denied having knowledge of his name appearing in the signature block of the engagement letter. Furthermore, Mr. Moawad indicated that he oversaw the firm's "business development," that he "primarily practiced transactional and intellectual property law," only handling immigration matters occasionally, and that he was one of several attorneys at the ABM firm who could authorize fee reductions.

The February 5 letter also referenced an "attached response" from Mr. Adams. The separate letter—dated February 1, 2018, signed by Mr. Adams, and submitted by Mr. Moawad's counsel—stated that Mr. Adams and Ms. Rashid were the "two attorneys of record from our law firm who represented Ms. Joy Liang." In the letter, Mr. Adams also stated that "[n]either [Ms.] Liang or her husband have been wronged by this firm in any respect," and that "her complaint of ethical misconduct is without merit."

As in the Togbetse and Hao matters, Mr. Adams testified that Mr. Moawad drafted the February 1 letter for him to sign in response to Ms. Liang's complaint. Again, the hearing judge found Mr. Adams' testimony credible. Furthermore, the hearing judge found that Mr. Moawad referred to the February 1 letter from Mr. Adams as an attachment to his

own response, thereby adopting the contents as part of his narrative in response to the investigation by Bar Counsel.

Thus, the hearing judge found that the letters submitted by Mr. Moawad and Mr. Adams to Bar Counsel contained knowing and intentional false statements about the firm's representation of Ms. Liang and Mr. Machado, Mr. Moawad's role at the ABM firm, and Mr. Moawad's responsibilities to the ABM firm clients. Mr. Adams testified that Mr. Moawad practiced immigration law when the firm was formed, and that he was the only attorney at the firm with a background in immigration law. Consequently, when an issue arose in an immigration matter, Mr. Moawad was "the principal source of information and expertise." Additionally, Mr. Adams testified that Mr. Moawad, as the ABM firm "business manager," "handled all the financial matters," "approved fees that were assessed within the firm[,]" and was the only attorney with access to the firm bank accounts. Finding Mr. Adams' testimony credible, the hearing judge concluded that the evidence was contrary to the assertions in Mr. Moawad's February 5 letter to Bar Counsel, and that Mr. Moawad had intentionally misrepresented his role at the ABM firm in connection to the Liang complaint in an attempt to distance himself from the ethical violations that occurred during Mr. Machado's immigration matter.

## STANDARD OF REVIEW

As we have previously articulated:

> In an attorney discipline proceeding, this Court reviews for clear error a hearing judge's findings of fact, and reviews without deference a hearing judge's conclusions of law. This Court determines whether clear and convincing evidence establishes that a lawyer violated a rule of professional conduct.

28

Either party may file exceptions to the findings and conclusions of the hearing judge. If a party excepts to the hearing judge's findings, this Court shall determine whether the findings of fact have been proved by the requisite standard of proof set out in Rule 19-727(c). We may confine our review to the findings of fact challenged by the exceptions, mindful though, that the hearing judge is afforded due regard to assess the credibility of witnesses. This Court will not disturb the hearing judge's findings where there is any competent evidence to support the finding of fact. Therefore, if the hearing judge's factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled.

*Attorney Grievance Comm'n v. Johnson*, 472 Md. 491, 526–27 (2021) (citations and quotations omitted).

## DISCUSSION

Bar Counsel does not except to any of the hearing judge's findings of fact or conclusions of law. Mr. Moawad filed extensive exceptions to both the hearing judge's findings of fact and conclusions of law. We shall address each of Mr. Moawad's exceptions below.

### A. *Mr. Moawad's Exceptions to the Hearing Judge's Findings of Fact.*

Mr. Moawad notes several exceptions to the hearing judge's factual findings related to the three complainants.

### 1. *Mr. Moawad's Exceptions Pertaining to Representation of Mr. Togbetse.*

Mr. Moawad excepts to the conclusion of the hearing judge that Mr. Moawad represented Mr. Togbetse at all times. Mr. Moawad alleges that this conclusion relies on several assumptions that are not supported by any evidence in the record. First, Mr. Moawad asserts that the engagement letters that the hearing judge relies on as evidence of

29

Mr. Moawad's involvement in the cases were printed on Moawad, P.C. letterhead, but the fact that Moawad, P.C. was a law practice maintained by Mr. Moawad individually is purely speculative, with no supporting evidence in the record.

Additionally, Mr. Moawad argues that the engagement letter did not specify the identity of the attorney who would represent Mr. Togbetse, and that Bar Counsel failed to introduce evidence that Mr. Moawad appeared on behalf of or undertook any actions for the representation of Mr. Togbetse. Moreover, Mr. Moawad argues that Mr. Adams testified that Mr. Moawad "did not work or file any of the USCIS filings[,]" which Mr. Moawad contends provides further support for the conclusion that he was not Mr. Togbetse's attorney. Mr. Moawad also asserts that the record contains evidence that Mr. Adams entered his appearance on behalf of Mr. Togbetse. In support of this assertion, Mr. Moawad points to Mr. Adams' testimony stating that in June 2016, Mr. Adams personally advised Mr. Togbetse that he needed to reopen the underlying asylum case. Mr. Moawad maintains that this testimony is the only evidence of any attorney providing legal advice to Mr. Togbetse, and that, absent additional evidence demonstrating Mr. Moawad was Mr. Togbetse's attorney, the hearing judge's conclusion constitutes clear error.

Next, Mr. Moawad indicates that the hearing judge committed clear error by concluding that Mr. Moawad agreed to file a motion to reopen Mr. Togbetse's removal proceeding for no additional legal fees. Mr. Moawad contends that Mr. Togbetse acknowledged that in August he met with Ms. Rashid and signed a Form G28 (Notice of Entry of Attorney Representative) to allow Ms. Rashid to enter her appearance as Mr. Togbetse's attorney of record for the purposes of reopening his removal proceeding.

30

Subsequently, Ms. Rashid remained in contact with Mr. Togbetse in an effort to complete and file a motion to reopen his case. On the basis of these assertions, Mr. Moawad contends that there is no evidence to support the hearing judge's finding, but instead ample evidence to the contrary, and therefore this finding constitutes clear error.

Mr. Moawad also excepts to the hearing judge's finding that Mr. Moawad made material misrepresentations to Bar Counsel in his April 12, 2017 letter, when he wrote that Mr. Adams provided "exceptional work in his representation of Mr. and Ms. Togbetse" because Mr. Moawad "was not the attorney representing Mr. Togbetse and had a very limited role in the ABM representation." Mr. Moawad alleges that this finding was based on the erroneous conclusion that he served as Mr. Togbetse's attorney. Additionally, Mr. Moawad excepts to the hearing judge's finding that he referred to the second April 12 letter, signed by Mr. Adams, as an attachment to his own response to Bar Counsel, thereby adopting the contents as part of his overall false narrative in response to the investigation by Bar Counsel. Mr. Moawad asserts that after an objection regarding the admissibility of the documents in court, the hearing judge held that Mr. Moawad did not adopt Mr. Adams' letter or its contents by virtue of having submitted it to Bar Counsel as an attachment to his own letter. Mr. Moawad argues that the hearing judge's finding is in contradiction with this ruling.

Many of Mr. Moawad's exceptions related to the Togbetse complaint turn on the credibility of the witness testimony given before the hearing judge. Mr. Togbetse clearly testified that he had multiple meetings with Mr. Moawad, and that he signed multiple engagement letters to secure Mr. Moawad's legal services. Mr. Togbetse also testified that

31

he met with Mr. Moawad exclusively until his USCIS interview in connection with his I-485 application on September 8, 2015, where he was accompanied by Mr. Adams. Additionally, Mr. Togbetse testified that he always believed that Mr. Moawad was his attorney until he terminated services with the firm in 2017.

Thus, Mr. Togbetse's testimony provided ample evidence of Mr. Moawad's involvement in his case throughout the disputed period and yielded enough evidence for the hearing judge to conclude that Mr. Moawad was in fact Mr. Togbetse's attorney. Accordingly, we find no error in the hearing judge's factual findings regarding Mr. Moawad's role as Mr. Togbetse's attorney and, in turn, the hearing judge's finding that Mr. Moawad intentionally made material misrepresentations to Bar Counsel disclaiming this representation.

Mr. Moawad also excepts to the conclusion of the hearing judge that Mr. Moawad contributed to a delay in the processing of Mr. Togbetse's case and that because of Mr. Moawad's error, Mr. Togbetse had to pay for and obtain the same required vaccinations multiple times. Mr. Moawad opines that this conclusion directly contradicts evidence contained in the record. Mr. Moawad points to Petitioner's Exhibit 4, which he asserts clearly states that Mr. Togbetse was required to submit a new I-693 and updated vaccination records due to the time that had elapsed since he submitted his prior documentation. Further, Mr. Moawad contends that Mr. Togbetse's testimony could not identify any actions or errors attributable to Mr. Moawad that delayed the processing of his case. Therefore, Mr. Moawad contends that the hearing judge's finding is wholly inconsistent with the record and constitutes plain error.

32

On this last exception, we agree that there was no clear evidence in the record that Mr. Moawad was solely responsible for Mr. Togbetse's need to obtain the same required vaccinations multiple times and the resulting cost. Although Mr. Togbetse testified to a delay in obtaining permanent resident status that is attributable to Mr. Moawad's lack of diligence, there was other testimony indicating a delay in processing his I-693 by USCIS even after Mr. Moawad was removed as counsel from the case. Bar Counsel did not provide clear evidence that Mr. Moawad was responsible for this delay, and therefore we sustain Mr. Moawad's exception. However, we overrule the remaining exceptions of Mr. Moawad regarding the findings of fact by the hearing judge concerning his representation of Mr. Togbetse.

2.      *Mr. Moawad's Exceptions Pertaining to Representation of Dr. Hao.*

Mr. Moawad first contends that the hearing judge's finding that Mr. Moawad's statements about "not knowing Dr. Hao or anything about [her] case" were knowing and intentionally false statements constitutes clear error. The hearing judge found that "the Notice of Entry of Appearance filed with USCIS was signed by Moawad" and "the brief submitted with Dr. Hao's application was also signed by Moawad." Mr. Moawad asserts that at trial Dr. Hao testified that she never saw these documents with the signature of an attorney affixed, and that she never received copies of these documents. Additionally, Bar Counsel never offered the notice of entry of appearance as an exhibit for admission, and therefore Mr. Moawad avers that considering it for any purpose is plain error.

Mr. Moawad also disputes the reliance of the hearing judge on Dr. Hao's I-140 petition and the supporting brief. Mr. Moawad contends that Bar Counsel attempted to

33

introduce these documents as an exhibit, but Mr. Moawad's counsel objected to their introduction and the hearing judge sustained the objection. Based upon this ruling, Mr. Moawad maintains that the exhibit was never offered for admission and that neither of these documents can be considered. Therefore, Mr. Moawad asserts, the record is devoid of any evidence that confirms the identity of the attorney who entered an appearance or filed forms with USCIS on Dr. Hao's behalf.

Additionally, Mr. Moawad alleges that the hearing judge conflates Dr. Hao's retainer of the ABM firm with retaining Mr. Moawad personally. Mr. Moawad argues that the July 18, 2015, engagement letter does not specify that Dr. Hao was retaining Mr. Moawad. Instead, the engagement letter recites that "Adams, Burton & Moawad, P.C., will provide legal services[.]" Mr. Moawad points out that the firm was founded by three equal partners, of which he has the least amount of experience practicing law.

Moreover, Mr. Moawad contends that the hearing judge inaccurately characterized Mr. Moawad's role in the work performed for Dr. Hao by describing a law clerk at the firm as "working for Moawad at the Chevy Chase Office[,]" despite no evidence to support that conclusion. Furthermore, Mr. Moawad states that a review of the inconsistencies in Mr. Adams' testimony, including the multiple different letters he wrote to Bar Counsel saying he represented Dr. Hao and then disclaiming the same, as well as Mr. Adams' general confusion throughout his testimony, renders it error for the court to find by clear and convincing evidence that Mr. Moawad was the specific attorney representing Dr. Hao. Mr. Moawad asserts that it therefore follows that it is clear error for the hearing judge to find

34

that he intentionally made false and misleading statements about his role in Dr. Hao's representation.

Mr. Moawad also relies on *Attorney Grievance Commission v. Stillwell* to contend that the hearing judge's reliance solely upon Dr. Hao's subjective assumption that Mr. Moawad was her lawyer ignores the legal principle that, while the attorney client privilege may attach based on a subjective determination, the actual formation of a particularized attorney client relationship requires agreement from both parties. 434 Md. 248, 277 (2013). Mr. Moawad indicates that mutual agreement is absent in this case as the record is devoid of any evidence that Mr. Moawad personally agreed to represent Dr. Hao—even with respect to Dr. Hao's own testimony. Therefore, Mr. Moawad alleges that the hearing judge erroneously concluded that he represented Dr. Hao, and further, that his statements to Bar Counsel were intentionally false and misleading.

The sum of Mr. Moawad's exceptions turns on whether sufficient evidence exists in the record to support the fact that Mr. Moawad was Dr. Hao's attorney. A hearing judge is given "a great deal of discretion in determining which evidence to rely upon." *Attorney Grievance Comm'n v. Miller*, 467 Md. 176, 195 (2020) (citing *Attorney Grievance Comm'n v. Woolery*, 462 Md. 209, 230 (2018)). This Court "generally 'defer[s] to the credibility findings of the hearing judge'" because the hearing judge is in the "best position to evaluate the credibility of the witnesses and to decide which one to believe and . . . to pick and choose which evidence to rely upon." *Attorney Grievance Comm'n v. Hodes*, 441 Md. 136, 181 (2014) (quoting *Attorney Grievance Comm'n v. Agbaje*, 438 Md. 695, 722 (2014) and *Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 683–84 (2002)).

35

Here, absent clear error, we defer to the hearing judge's credibility determination of Dr. Hao's testimony. *See* Md. Rule 19-741(b)(2)(B) ("Th[is] Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."). We find no clear error. Dr. Hao testified in detail about the multiple factors upon which she relied to form her belief that Mr. Moawad was her attorney. First, her initial meeting was solely with Mr. Moawad. Second, she signed an engagement letter that was presented to her by Mr. Moawad and that identified Mr. Moawad as the managing director of the firm. Third, her single interaction with Mr. Adams was when Mr. Moawad failed to appear for what should have been the initial meeting.

From these facts and the testimony of Dr. Hao, the hearing judge had sufficient evidence to draw the conclusion that there was clear and convincing evidence that Mr. Moawad served as Dr. Hao's attorney. *See Hodes,* 441 Md. at 181. There is no evidence that the hearing judge relied on the various documents not admitted as evidence, such as the notice of entry of appearance, the I-140 petition, or the brief submitted with Dr. Hao's application, to make this determination. Further, we find that the hearing judge made no clear error in determining that Mr. Moawad was responsible for the oversight of the non-attorney staff members that worked on Dr. Hao's case. We defer to the credibility determination of the hearing judge with respect to the testimony of Dr. Hao and Mr. Adams, and this testimony supported a valid conclusion that, as managing director, oversight of non-attorney staff was part of Mr. Moawad's duties.

For the reasons stated above, we overrule Mr. Moawad's exceptions to the findings of fact by the hearing judge concerning his representation of Dr. Hao.

36

*3.      Mr. Moawad's Exceptions Pertaining to Representation of Ms. Liang.*

Mr. Moawad excepts to the hearing judge's findings that the ABM firm failed to provide competent legal representation to Ms. Liang and Mr. Machado, and that Mr. Moawad failed to appropriately supervise non-attorney staff handling the representation. Mr. Moawad alleges that these findings by the hearing judge ignore relevant evidence in the record to the contrary, including that the engagement letter signed by Ms. Liang only indicated that the ABM firm would be handling the case and failed to specify which attorney would serve as the attorney of record. Moreover, Mr. Moawad emphasizes that Ms. Liang testified that she and her husband never met with an attorney, and that she had no expectation or belief that Mr. Moawad was representing her or her husband. Mr. Moawad also points out that Mr. Adams provided testimony that he, along with Ms. Rashid, were the two attorneys of record representing Ms. Liang, and thus it would have been Mr. Adams' and Ms. Rashid's responsibility to supervise the non-attorney staff handling the representation.

Further, Ms. Moawad excepts to the finding by the hearing judge that he made intentional misrepresentations "in an attempt to distance himself from the ethical violations that occurred during Mr. Machado's immigration matter" because Mr. Moawad alleges that the hearing judge never identified any ethical violation that occurred.

As we have noted above, the hearing judge is in the best position to determine the credibility of witnesses. *See Hodes*, 441 Md. at 181. Here, the hearing judge found the testimony of Ms. Liang and Mr. Adams credible. Ms. Liang testified that throughout the duration of her retainer of the ABM firm, she never met with an attorney. Ms. Liang also

37

testified that most of her contact was with Ms. Carrasquel, a non-attorney staff member at the firm, and another "intern." Mr. Adams testified that, as managing director of the firm, Mr. Moawad was responsible for overseeing the non-attorney staff members of the firm, and that Mr. Moawad was the "principal source of information and expertise" for immigration matters at the firm. Additionally, as managing director, Mr. Moawad oversaw the financial matters of the firm, and thus Ms. Liang was appropriately referred to Mr. Moawad when she requested an accounting and a reduction of her fee.

Therefore, for the reasons stated above, we overrule Mr. Moawad's exceptions to the findings of fact by the hearing judge concerning his representation of Ms. Liang.

## B. *Conclusions of Law.*

The hearing judge concluded that Mr. Moawad violated Rules 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 5.3 (Responsibilities Regarding Non-Attorney Assistants), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct). Bar Counsel does not except to any of the hearing judge's conclusions of law. Mr. Moawad excepts to the hearing judge's conclusions with respect to every rule violation. Based on an independent review of the record, we uphold the hearing judge's conclusions of law. *See Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 97 (2002) ("[a]s the Court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record.") (quoting *Attorney Grievance Comm'n v. Snyder*, 368 Md. 242, 253 (2002)).

38

*1.    Rule 1.1 (Competence).*

Rule 1.1 requires that "[a]n attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." This Court has found that "[e]vidence of a failure to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of Rule 1.1." *Attorney Grievance Comm'n v. Conwell*, 462 Md. 437, 462 (2019) (quoting *Attorney Grievance Comm'n v. McCulloch*, 404 Md. 388, 398 (2008)); *see also Attorney Grievance Comm'n v. Blair*, 440 Md. 387, 401–02 (2014).

The hearing judge found that Mr. Moawad's conduct violated Rule 1.1 in a number of ways. In Mr. Moawad's representation of Dr. Hao, Mr. Moawad violated the Rule by erroneously filing an I-140 petition with the designation of EB-1B, which requires an employer to file the petition, instead of the appropriate designation of EB-1A. This error resulted in the denial of the I-140 petition and the denial of Dr. Hao's associated I-485 application for lawful permanent resident status.

Further, the hearing judge found that Mr. Moawad also violated Rule 1.1 in his representation of Mr. Togbetse in a number of ways. First, the hearing judge found that Mr. Moawad failed to recognize or understand that the USCIS lacked jurisdiction to grant Mr. Togbetse's requested adjustment of status and that EOIR retained jurisdiction of the proceeding. When Mr. Moawad erroneously filed Mr. Togbetse's I-485 application with USCIS instead of properly with EOIR, the hearing judge found this to be a failure to exercise the legal knowledge, skill, thoroughness, and preparation necessary to represent

39

Mr. Togbetse competently. Additionally, the hearing judge found that Mr. Togbetse suffered prejudice in the form of an approximately two-year delay waiting for the outcome of the mistaken USCIS filing, as well as further delay from Mr. Moawad's agreement to take remedial action but subsequent failure to do so. The hearing judge concluded that Mr. Moawad's failure to take action to accomplish Mr. Togbetse's objective of obtaining permanent resident status also violated Rule 1.1.

Finally, the hearing judge found that Mr. Moawad violated Rule 1.1 in his representation of Ms. Liang by failing to pursue an appropriate strategy to adjust Mr. Machado's immigration status to that of a lawful permanent resident. Although Mr. Moawad did not provide services to Ms. Liang and Mr. Machado directly, the problematic issues with their case were due to a lack of attorney oversight. Mr. Moawad's managerial role within the firm made him responsible for the lack of competent services provided to Mr. Machado, as evidenced by the multiple rejections and refiling of Mr. Machado's I-601A application.

Mr. Moawad excepts to the conclusion that he violated Rule 1.1. As discussed above, Mr. Moawad indicates that the hearing judge made an erroneous finding of fact by concluding that he was the attorney of record for both Dr. Hao and Mr. Togbetse. Mr. Moawad contends that in both cases, he did not violate Rule 1.1 because he was not the attorney of record and therefore not responsible for the legal services provided in these cases.

Furthermore, Mr. Moawad contends that Bar Counsel did not prove by clear and convincing evidence that he was aware of the denial of Dr. Hao's EB-1B until November

40

14, 2017, when he responded to Dr. Hao's email advising her to "[k]indly address all inquiries directly to your attorney Mr. George Adams." Finally, Mr. Moawad contends that the rule violation related to the case of Ms. Liang rests on the erroneous assumption that Mr. Moawad was charged with overseeing the tasks performed by non-attorney staff.

Our independent review of the record confirms that the hearing judge's conclusion that Mr. Moawad's conduct violated Rule 1.1 is supported by clear and convincing evidence. Mr. Moawad failed to file the correct EB-1 designation in the case of Dr. Hao, failed to file Mr. Togbetse's I-485 application with EOIR and instead erroneously filed it with USCIS, and failed to provide appropriate oversight to non-attorney staff, which resulted in a lack of competent representation of Ms. Liang and Mr. Machado. In the cases of Mr. Togbetse and Ms. Liang, Mr. Moawad took no action whatsoever that furthered the client's objective of obtaining permanent resident status. *See Conwell,* 462 Md. at 463 (holding an attorney violated Rule 1.1 where his "failure to apply the requisite thoroughness and preparation . . . prejudiced [his client's] case by not furthering his cause of action").

### 2. *Rule 1.3 (Diligence).*

Rule 1.3 requires that "[a]n attorney shall act with reasonable diligence and promptness in representing a client." This Court has held that "an attorney violates Rule 1.3 when he or she does 'nothing whatsoever to advance the client's cause or endeavor.'" *Attorney Grievance Comm'n v. De La Paz*, 418 Md. 534, 554 (2011) (quoting *Attorney Grievance Comm'n v. Bahgat*, 411 Md. 568, 575 (2009)).

The hearing judge found that Mr. Moawad's conduct violated Rule 1.3 in the cases of all three complainants. In Mr. Moawad's representation of Dr. Hao, Mr. Moawad violated the Rule by not responding to Dr. Hao's request for assistance when the EB-1B filing was rejected in April 2017 and by taking no additional action to remediate his error in filing the wrong EB-1 from April to November 2017. Further, the hearing judge concluded that Mr. Moawad violated Rule 1.3 in his representation of Mr. Togbetse by agreeing to file a motion to reopen Mr. Togbetse's proceeding before EOIR but taking no action to do so. Finally, the hearing judge found that Mr. Moawad violated Rule 1.3 in his representation of Ms. Liang, because as managing partner he was responsible for his firm's failures to act with reasonable diligence and promptness in representing Mr. Machado, to exercise appropriate diligence in completing Mr. Machado's I-601A filing for several months, and to exercise the appropriate attention to detail and diligence in the filing Mr. Machado's I-601A application.

Mr. Moawad excepts to this conclusion of law with respect to each of the three complainants. Mr. Moawad indicates that the conclusion by the hearing judge that Mr. Moawad took no action to further Mr. Togbetse's objective of obtaining permanent resident status is misdirected because it rests on the flawed assumption that Mr. Moawad was Mr. Togbetse's attorney. Mr. Moawad purports that Ms. Rashid was the attorney of record for Mr. Togbetse. Thus, Mr. Moawad reasons that because he was not the attorney responsible for reopening Mr. Togbetse's asylum case, his lack of diligence is not at issue.

Our independent review of the record confirms that the hearing judge's conclusion that Mr. Moawad's conduct violated Rule 1.3 is supported by clear and convincing

42

evidence. There is substantial evidence to support the fact that Mr. Moawad served as an attorney for both Mr. Togbetse and Dr. Hao, and that Mr. Moawad was responsible to oversee the actions of the non-attorney staff handling the case of Ms. Liang and Mr. Machado. Thus, we agree that Mr. Moawad failed to act with reasonable diligence and promptness in representing all three complainants, specifically by failing to take any action to reopen Mr. Togbetse's removal proceeding, by failing to respond to Dr. Hao's request for assistance after the EB-1B filing error came to light in April 2017, and by failing to oversee the non-attorney staff who erroneously filed Mr. Machado's I-601A.

*3. Rule 1.4 (Communication).*

Rule 1.4 provides in pertinent part:

(a) An attorney shall:
***
> (2) keep the client reasonably informed about the status of the matter;
> (3) promptly comply with reasonable requests for information[.]
***
(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Pursuant to Rule 1.4, this court has previously noted that "the failure to keep a client reasonably informed about the progress of his representation is a violation of [MAPRC 1.4]." *Miller*, 467 Md. at 220 (quoting *Attorney Grievance Comm'n v. Van Nelson,* 425 Md. 344, 359 (2012)).

First, with respect to the Togbetse matter, the hearing judge concluded that Mr. Moawad was not responsive to text messages sent by Mr. Togbetse during the period after Mr. Togbetse's September 8, 2015, I-485 interview nor did he return text messages and phone calls made during the spring of 2016. This lack of communication prompted Mr.

43

Togbetse to independently request an InfoPass appointment with USCIS to obtain an update on the status of his case. Additionally, after signing an engagement letter addendum in which Mr. Moawad promised to file a motion to reopen Mr. Togbetse's asylum case, Mr. Togbetse regularly attempted to communicate with the ABM firm staff members but was unable to obtain an update.

Once more, Mr. Moawad excepts to the hearing judge's finding that he was the attorney of record for Mr. Togbetse, instead claiming that Mr. Adams was Mr. Togbetse's attorney following the I-485 interview and Ms. Rashid was his attorney after the engagement letter addendum in 2016. As explained above, our independent review of the record demonstrates that Mr. Moawad represented Mr. Togbetse, and we therefore agree with the hearing judge that Mr. Moawad's conduct with respect to the Togbetse matter violated Rule 1.4(a)(2) and (3).

Next, with respect to the Hao matter, the hearing judge concluded that Mr. Moawad did not keep Dr. Hao reasonably informed about the status of her case and did not promptly comply with her reasonable requests for information. The hearing judge found that Mr. Moawad's lack of communication occurred during the latter part of his representation of Dr. Hao, specifically after USCIS denied Dr. Hao's erroneously filed EB-1B petition in April 2017. As a result of his unresponsiveness, the hearing judge found that Mr. Moawad failed to explain the denial of the EB-1B petition to Dr. Hao to the extent reasonably necessary for her to make an informed decision regarding representation, which in turn resulted in an additional six month delay before Dr. Hao sought new counsel. Similar to the Togbetse matter, Mr. Moawad excepts to the hearing judge's conclusion that he was

44

Dr. Hao's attorney and thus that he was responsible for the lack of communication. Our independent review of the record yields sufficient evidence to determine that Mr. Moawad represented Dr. Hao. Therefore, we agree with the hearing judge's conclusion that Mr. Moawad exhibited a pattern of behavior that violated Rule 1.4(a)(2) and (3) and Rule 1.4 (b) in the Hao matter.

Lastly with respect to the Liang matter, the hearing judge found that the ABM firm failed to provide Ms. Liang and Mr. Machado with the necessary information to assist Mr. Machado in obtaining permanent resident status. This failure was attributable to the lack of consistent attorney oversight of the non-attorney staff, which the hearing judge concluded was ultimately the responsibility of Mr. Moawad based on the testimony of Mr. Adams and Ms. Liang, as well as other evidence as addressed above. Therefore, we agree with the hearing judge's conclusion that Mr. Moawad violated Rule 1.4(a)(2) and (3) and Rule 1.4 (b) with respect to the Liang matter.

4.    *Rule 1.5 (Fees).*

Rule 1.5 provides, in pertinent part:

(a) An attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the attorney or attorneys performing the services; and
(8) whether the fee is fixed or contingent.

This Court has previously noted that "[t]he reasonableness of a fee is not measured solely by examining its value at the outset of the representation" and that "an otherwise reasonable fee can become unreasonable if the lawyer fails to earn it." *Miller*, 467 Md. at 217 (quoting *Attorney Grievance Comm'n v. Thompson*, 462 Md. 112, 125 (2018)). Additionally, this Court has stated that "[i]t is irrelevant that the fee is 'initially reasonable' if the attorney fails to perform any of the services for which the attorney was paid." *Attorney Grievance Comm'n v. Gray*, 444 Md. 227, 254 (2015) (quoting *Attorney Grievance Comm'n v. Gage-Cohen*, 440 Md. 191, 198–99 (2014)).

First with respect to the Togbetse matter, the hearing judge found that Mr. Moawad violated Rule 1.5(a) by charging Mr. Togbetse legal fees totaling $3,500 to provide two services, one of which, filing the I-485 application, was unsuccessful due to lack of competence and diligence. The hearing judge concluded that the lack of competence and the incompletion of services rendered the overall fee charged unreasonable.

Mr. Moawad excepts to this finding, asserting that the hearing judge's conclusion rests on the flawed assumption that the administrative closure of the I-485 application had no value to Mr. Togbetse's case. Mr. Moawad argues that an adjudicated case cannot be reopened without some new change in circumstances, and here the requisite change in circumstances in Mr. Togbetse's case was the denial of the I-485 application. Therefore, Mr. Moawad reasons that Ms. Rashid's efforts to file a motion to reopen the asylum case relied upon the denial. Even though the motion was not filed, Mr. Moawad argues that the

46

evidence in the record makes it clear that Mr. Togbetse suffered no prejudice from the delay because once Mr. Togbetse hired a new attorney to represent him in June 2017, the motion still had not been acted on. Accordingly, Mr. Moawad purports there is no evidence that the procedure followed by the ABM firm was improper.

Based on our independent review of the record, we find that Mr. Moawad was in violation of Rule 1.5(a) in the Togbetse matter by retaining the full cost for services that were not rendered. Mr. Moawad and his firm failed to complete the services that Mr. Togbetse contracted for in his initial engagement of the firm.

Next with respect to the Hao matter, the hearing judge found that the $7,000 legal fee that Mr. Moawad charged Dr. Hao at the outset of her retention of the ABM firm became unreasonable based on the firm's filing error and ultimate failure to advance Dr. Hao's interest. The hearing judge concluded that by refusing to refund any portion of the fee, Mr. Moawad's original fee became unreasonable and was thus in violation of Rule 1.5(a).

Mr. Moawad excepts to this finding and argues that the firm ultimately filed a new EB-1A visa application on Dr. Hao's behalf without charging her for either the attorney's time or for the filing fees. Mr. Moawad indicates that because of the firm's corrective action following the mistaken filing, Dr. Hao received the "full benefit of the services she contracted for at the price she negotiated in the beginning of the relationship."

Based on our independent review of the record, we agree with the hearing judge's finding that Mr. Moawad violated Rule 1.5(a) in the Hao matter. Although Mr. Moawad's firm eventually did file the correct form to advance Dr. Hao's interest, the lack of

47

competence and diligence resulted in a prejudice to Dr. Hao by causing a lengthy delay and significant concerns about her continued employment in the United States. However, despite this prejudice to Dr. Hao, Mr. Moawad refused to refund any portion of the fee.

Lastly with respect to the Liang matter, the hearing court found that the $6,900 in fees charged to Ms. Liang and Mr. Machado became unreasonable due to the ABM firm's lack of competence and diligence in the representation. The hearing court found that the value of the legal services provided to the couple was "diminished due to the problems encountered by Ms. Liang and Mr. Machado" while represented by the ABM firm. Therefore, the hearing judge concluded that the fees were unreasonable and thus in violation of Rule 1.5(a).

Mr. Moawad excepts to this finding, arguing that he did not personally charge the fee in this matter, but rather that the ABM firm charged Ms. Liang and Mr. Machado. Consequently, Mr. Moawad argues that he should not be held responsible for the unreasonableness of the fee. Additionally, Mr. Moawad contends that no evidence was presented regarding the reasonableness or unreasonableness of the fee, and there was no evidence in the record to show that he "had anything to do with setting the fees in this case." Finally, Mr. Moawad contends that Bar Counsel "failed to introduce any evidence that the processing of this case resulted in . . . anything less than that for which [Ms. Liang] contracted."

Here, we agree that Mr. Moawad violated Rule 1.5(a). During the evidentiary hearing, there was testimony by Ms. Liang indicating that she was directed to email Mr. Moawad to receive an accounting of what she owed to the firm, as well as testimony by

48

Mr. Adams corroborating that, as managing director, Mr. Moawad was responsible for the billing practices of the firm. Accordingly, Mr. Moawad was responsible for decisions by the firm regarding the fees related to its practice, and thus he violated Rule 1.5(a) by not reducing Mr. Liang's fee despite the ABM firm's lack of competence and diligence in her matter.

     5.     *Rule 5.3 (Responsibilities Regarding Non-Attorney Assistants).*

Rule 5.3 provides, in pertinent part:

> With respect to a non-attorney employed or retained by or associated with an attorney:
>
>                         \*\*\*
>
> (a) an attorney having direct supervisory authority over the non-attorney shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the attorney[.]

Rule 5.3 "requires attorneys with direct supervisory authority over a nonlawyer to make 'reasonable efforts' to ensure that employee's conduct is in fact compatible with the attorney's professional responsibilities." *Attorney Grievance Comm'n v. Smith,* 443 Md. 351, 367 (2015) (quoting *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 374 (2005)). "We have held that 'had the respondent exercised a reasonable degree of supervision over [his employee], he might have detected [the employee's] error before any ethical proscriptions had been violated' under Rule 5.3." *Zuckerman,* 386 Md. at 374 (citing *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 481 (1996)).

The hearing judge concluded that Mr. Moawad violated Rule 5.3(b) because he was the "managing director" of the ABM firm and its principal immigration attorney. Therefore, he had direct supervisory authority over the non-attorney staff in the firm's

immigration practice.  For the reasons discussed above in connection with Rules 1.1, 1.3, and 1.4, the hearing judge found Mr. Moawad was responsible for the errors and omissions of his non-attorney staff in the Liang matter.  Additionally, the hearing judge found that had Mr. Moawad taken reasonable efforts to ensure that the conduct of his non-attorney staff was compatible with his professional obligations, the errors would not have occurred.

Mr. Moawad excepts to this finding and argues that the record does not identify a single task performed on Ms. Liang's behalf by non-attorney staff.  Mr. Moawad contends that despite Ms. Liang's testimony indicating that she never spoke to an ABM attorney, that the record demonstrates that both Mr. Adams and Ms. Rashid were involved in her representation.

We concur with the hearing judge that Mr. Moawad had direct supervisory authority over the non-attorney staff in the ABM firm's immigration practice as managing director and was therefore responsible for the errors and omissions of his staff.  Ms. Liang testified that she only had communication with interns and paralegals throughout the duration of her representation by the ABM firm, and Mr. Adams testified that Mr. Moawad was the immigration expert at the firm that handled any matters or questions from other staff members relating to the firm's immigration practice.

6. *Rule 8.1 (Bar Admission and Disciplinary Matters).*

Rule 8.1 provides, in pertinent part:

An applicant for admission or reinstatement to the bar, or an attorney in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact[.]

50

This Court has previously found a violation of Rule 8.1(a) where an attorney knowingly made misrepresentations to Bar Counsel during the course of Bar Counsel's investigation. *See Attorney Grievance Comm'n v. Mollock*, 450 Md. 133, 153 (2016). Here, the hearing judge found that Mr. Moawad made false statements of material fact in his response to Bar Counsel concerning the matters of all three complainants.

Specifically, multiple letters sent to Bar Counsel from Mr. Moawad, either personally or through counsel, and the accompanying letters drafted by Mr. Moawad for Mr. Adams' signature contained a plethora of false statements. We agree with the hearing judge's conclusion that these letters were intended to advance the false narrative that Mr. Adams represented Mr. Togbetse, Dr. Hao, and Ms. Liang, and that the ABM firm as a whole—not Mr. Moawad—was contracted to provide the legal services at issue. The hearing judge noted that in one of the letters sent to Bar Counsel, Mr. Moawad stated that he only practiced immigration law on an "occasional" basis and was unaware that his name was being used in the signature block of the engagement letter presented to Mr. Machado. However, there was evidence to support that Mr. Moawad was extensively involved in the firm's immigration practice and was aware that his name was regularly inserted into the signature block of engagement letters for the firm's immigration clients.

Mr. Moawad excepts to this conclusion, arguing that the record is devoid of any evidence that he represented any of the three complainants, or that he filed any of the various immigration forms on behalf of the three complainants. Finally, Mr. Moawad

contends that there is no evidence that he generated the engagement letters or was aware that his name appeared on them.

We first reiterate that our independent review of the record decisively demonstrates that Mr. Moawad was involved in the legal representation of all three clients, either as the attorney of record, or through his responsibilities as the managing director of the firm. Furthermore, there is clear and convincing evidence that Mr. Moawad—personally, through counsel, and under the pretext of Mr. Adams—repeatedly and knowingly made multiple misrepresentations to Bar Counsel in connection with each of the three complainants' cases. *See*, *supra*, Background (B)(4). Therefore, we find that Mr. Moawad violated Rule 8.1(a).

   7.   *Rule 8.4 (Misconduct).*

Rule 8.4 provides, in pertinent part:

It is professional misconduct for an attorney to:

> (a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
> ***
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
> (d) engage in conduct that is prejudicial to the administration of justice[.]

Pursuant to Rule 8.4(a), this Court has held that "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate the Maryland Lawyer's Rules of Professional Conduct[.]" *Attorney Grievance Comm'n v. Foltz*, 411 Md. 359, 411 (2009) (citing *Attorney Grievance Comm'n v. Webster*, 402 Md. 448, 468 (2007)). This Court has noted

52

that when a respondent has violated multiple Rules of Professional Conduct, he or she has "necessarily violated MRPC 8.4(a) as well[.]" *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 710–11 (2002).

With respect to Rule 8.4(c), this Court has held that it is professional misconduct under Rule 8.4(c) for an attorney to "'engage in conduct involving dishonesty, fraud, deceit or misrepresentation,' whereby 'dishonest acts, in and of themselves are violative of [MLRPC] 8.4(c).'" *Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 66 (2018) (quoting *Attorney Grievance Comm'n v. Barnett*, 440 Md. 254, 266 (2014)). In addition, this Court has "previously applied the 'general proposition that a violation of Rule 8.1(a) also violates Rule 8.4(c), as a knowingly false statement to Bar Counsel qualifies as at least conduct involving misrepresentation.'" *Miller*, 467 Md. at 222–23 (citing *Attorney Grievance Comm'n v. Singh*, 464 Md. 645, 677 (2019)).

Turning to subsection (d) of Rule 8.4, we have stated that an attorney violates this rule "when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Lang*, 461 Md. at 66 (citing *Barnett*, 440 Md. at 267). Further, we have found a violation of Rule 8.4(d) when an attorney participates in conduct "which tends to bring the legal profession into disrepute[.]" *Attorney Grievance Comm'n v. Rose*, 391 Md. 101, 111 (2006). Finally, "a violation of [Rule] 8.4(c) may also violate [Rule] 8.4(d)." *Lang*, 461 Md. at 66 (citing *Attorney Grievance Comm'n v. Payer*, 425 Md. 78, 95 (2012)).

The hearing court found that Mr. Moawad violated Rules 8.4(a), (c), and (d) in each of the three complainants' matters. Mr. Moawad continues to except to these violations on

the basis that he was not the attorney of record for any of the complainants. However, we continue to overrule this exception.

We agree with the hearing judge's conclusions that Mr. Moawad violated many other Rules (Rule 1.1, Rule 1.3, Rule 1.4(a)(2) and (3), Rule 1.4(b), Rule 1.5(a), Rule 5.3(b), and Rule 8.1(a)), and therefore we find that he has "necessarily violated MRPC 8.4(a) as well." *Gallagher*, 371 Md. at 710–11. Because a violation of Rule 8.1(a) is also a violation of Rule 8.4(c), we accordingly conclude that Mr. Moawad has violated Rule 8.4(c) as well. However, we additionally note that Mr. Moawad's knowingly false statements contained in the series of letters sent to Bar Counsel during the course of their disciplinary investigation constituted conduct "involving dishonesty, fraud, deceit or misrepresentation" and thus provided an independent basis for his violation of Rule 8.4(c).

Lastly, the hearing judge found that Mr. Moawad's failure to honor the engagement letter addendum promising to reopen Mr. Togbetse's asylum case at no charge and his overall representation of Dr. Hao violated Rule 8.4(d) because of its negative impact on public confidence in the legal profession. We agree that Mr. Moawad's lack of diligence and competence as well as his intentionally deceitful behavior in both of these matters reflect negatively on the legal profession as a whole and constitutes a violation of Rule 8.4(d).

## SANCTION

We now turn to the appropriate sanction. "The sanction for a violation of the Maryland Rules of Professional Conduct depends on the facts and circumstances of each case[.]" *Attorney Grievance Comm'n v. Reinhardt*, 391 Md. 209, 223 (2006) (citing

*Zuckerman*, 386 Md. at 375). This Court has regularly stated that the primary purpose of attorney discipline proceedings is not to punish the lawyer, but instead to protect the public and deter other lawyers from engaging in misconduct. *See Attorney Grievance Comm'n v. Pak*, 400 Md. 567, 609 (2007) (quoting *Reinhardt*, 391 Md. at 223). "In order to protect the public, we impose a sanction commensurate with the nature and gravity of the violations and the intent with which the violations were committed." *Reinhardt*, 391 Md. at 223 (citing *Attorney Grievance Comm'n v. Goodman*, 381 Md. 480, 497 (2004)). Additionally, when determining the appropriate sanction, this Court is guided by the interest in inspiring "confidence in the legal profession." *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 595 (2005) (citing *Attorney Grievance Comm'n v. Powell*, 369 Md. 462, 474 (2002)).

In this case, Bar Counsel recommends that this Court disbar Mr. Moawad. Bar Counsel emphasizes that Mr. Moawad's conduct included a pattern of intentional misrepresentation to conceal his wrongdoing and that, when presented with the complaints of Mr. Togbetse, Dr. Hao, and Ms. Liang, Mr. Moawad fabricated explanations and falsely portrayed his role in their cases and in the ABM firm's immigration practice. Additionally, Bar Counsel notes that Mr. Moawad did not offer any evidence of any extenuating circumstances or mitigating factors and has displayed an indifference to rectifying any of his mistakes.

On the other hand, Mr. Moawad asserts that the hearing judge made clear errors throughout the findings of fact and conclusions of law, and that this Court should find that he did not violate any Rules. Therefore, Mr. Moawad recommends the matter be

55

dismissed. Alternatively, Mr. Moawad suggests that if this Court does find Rule violations, any sanction imposed should be "tempered by the fact that any errors involved in the representation of the three clients . . . [were] in the nature of negligence rather than intentional acts of malfeasance." Thus, in any case, Mr. Moawad recommends that the sanction should be less severe than a suspension of his license to practice law.

In support of this recommendation, Mr. Moawad relies on *Attorney Grievance Commission v. Mooney*, which was a case where this Court found that an attorney violated Rules 1.1., 1.3, 1.4, 5.1, 5.3, 8.4(a), and 8.4(d). 359 Md. 56 (2000). Mr. Moawad contends that this case is analogous to his because the Rule violations are similar. However, Mr. Moawad argues that the conduct in *Mooney* was far more egregious because the attorney failed to appear at trial, lied to a client's mother about steps he would take to assist the client in jail, and otherwise seriously prejudiced his clients' cases. *See id.* at 74, 77, 87, 89–90, 93–95. Mr. Moawad notes that even though the court only found a single mitigating factor in *Mooney*, the attorney only received an indefinite suspension, with the right to apply for reinstatement after ninety days. *Id.* Therefore, Mr. Moawad maintains a similar sanction would be appropriate here.

Mr. Moawad also seeks support from *Attorney Grievance Commission v. Chanthunya*, 446 Md. 576 (2016). In *Chanthunya*, this Court found that an immigration attorney violated Rules 1.1, 1.3, 1.4(a)(2), 1.4(a)(3), 1.4(b), and 8.4(d), where his conduct "cost [one client] the opportunity to have USCIS consider an appeal, and impeded the progress of both of his clients in becoming naturalized." *Id.* at 607. In *Chanthunya*, the attorney received an indefinite suspension from the practice of law in Maryland, with the

right to apply for reinstatement after sixty days. *Id.* at 609. Mr. Moawad contends that his own actions did not prejudice the clients nearly as much as the actions of the attorney in *Chanthunya* because he did not jeopardize any of the complainants' abilities to continue to live in the United States. *See id.* at 608.

However, it is apparent to us that this case differs substantially from the cases relied upon by Mr. Moawad. Here, Mr. Moawad intentionally attempted to cover up his involvement with respect to all three of the complainants to avoid accountability. Mr. Moawad's conduct went far beyond a mere lack of diligence or negligence. To the contrary, Mr. Moawad engaged in a persistent pattern of conduct to deceive Bar Counsel by misrepresenting his involvement in the complainants' cases as well as his role in the ABM firm's immigration practice. Throughout the investigatory process, Mr. Moawad attempted to deflect blame on his former business partner, Mr. Adams, and other ABM staff. This Court has held that "[w]hen an attorney's conduct involves intentional dishonesty, fraud, deceit or misrepresentation, we do not discuss 'degrees' of dishonesty, but generally order disbarment, absent compelling extenuating circumstances." *Attorney Grievance Comm'n v. Garcia*, 410 Md. 507, 521 (2009) (quoting *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 418 (2001)). This is because, different from matters related to competency and diligence, "intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse." *Vanderlinde*, 364 Md. at 418.

When determining an appropriate sanction in attorney disciplinary proceedings, this Court "consider[s] the facts of the case" while "balancing any aggravating or mitigating

factors." *Attorney Grievance Comm'n v. Smith-Scott*, 469 Md. 281, 364 (2020) (quoting *Attorney Grievance Comm'n v. Sanderson*, 465 Md. 1, 67 (2019)). An attorney bears the burden of proving evidence of mitigation by a preponderance of the evidence. *See* Md. Rule 19-727(c).

This Court has emphasized that aggravating factors "militate in favor of a more severe sanction[.]" *Sanderson*, 465 Md. at 67 (quoting *Attorney Grievance Comm'n v. Kremer,* 432 Md. 325, 337 (2013)). Here, the hearing judge found the following aggravating factors: (1) dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (5) vulnerability of victim; and (6) indifference to making restitution.

Mr. Moawad posits that the finding of these aggravating factors is premised on the hearing judge's erroneous factual findings and flawed conclusions of law. Mr. Moawad, once again, puts forth the argument that he was not the attorney of record for any of the complainants and therefore has not displayed a dishonest or selfish motive by pointing out Mr. Adams' poor representation of each of the complainants. As we have underscored above, there is sufficient evidence in the record to reject this contention. Mr. Moawad also excepts to the hearing judge's finding that he engaged in a "pattern of misconduct." However, in our independent review of the record, we find that Mr. Moawad did engage in a pattern of misconduct.

Next, Mr. Moawad excepts to the hearing judge's finding that the clients here were vulnerable victims. Mr. Moawad asserts that the complainants in this case should not be

58

recognized as "vulnerable victims" by virtue of their immigration status because the complainants are not the "type of historically disadvantaged immigrants for which the Court has traditionally recognized as 'vulnerable victims.'" Mr. Moawad argues that Dr. Hao is an accomplished medical doctor with significant education and work history in the United States, and that Mr. Togbetse is an "articulate gentleman" who arrived in the country to further his education and has ultimately established a career as an Emergency Medical Technician. Additionally, he points out that Ms. Liang is an American citizen.

This Court has emphasized a need to protect the public by "impress[ing] upon . . . lawyers, the importance of diligent representation and adequate communication in immigration cases." *Attorney Grievance Comm'n v. Landeo*, 446 Md. 294, 352–53 (2016); *see also Attorney Grievance Comm'n v. Thomas,* 440 Md. 523, 558 (2014). Although the circumstances of Mr. Togbetse, Dr. Hao, and Ms. Liang may differ from many immigrants' experiences, this fact does not prevent each of the clients in this case from being classified as vulnerable. Mr. Moawad's actions in this case caused substantial prejudice that risked impacting his clients' ability to maintain jobs and homes in the United States. The potential to be removed from the country is a grave risk that is specific to immigrants who do not have permanent status within the United States, thereby making them vulnerable regardless of what occupation or socioeconomic status they have attained. Attorneys play an important role in protecting this vulnerable class, and hence attorneys who provide substandard services to immigrants should, in turn, face significant consequences.

Turning to Mr. Moawad's final exception to the hearing judge's findings of aggravating factors, Mr. Moawad contends that the hearing judge erroneously found that

59

he "displayed an indifference to making restitution to Dr. Hao and Ms. Liang" and that he "failed to honor his agreement to provide remedial legal service" to Mr. Togbetse at no additional fee. Mr. Moawad maintains that both Dr. Hao and Ms. Liang received precisely the services that they contracted for. Additionally, Mr. Moawad claims that Dr. Hao's EB-1 visa was refiled at no cost to her, including filing fees, and that Ms. Rashid attempted to assist Mr. Togbetse with "remedial legal services."

However, we find that the record sufficiently supports that Mr. Moawad has demonstrated a clear indifference towards restitution and failed to honor his agreement with Mr. Togbetse. Mr. Moawad repeatedly disclaims any fault—and therefore any necessary restitution—by asserting that Mr. Togbetse, Dr. Hao, and Ms. Liang were not his clients. In addition, Mr. Moawad evaded communication with Dr. Hao and Ms. Liang, both of whom attempted to contact him when they were reasonably dissatisfied with the legal services provided and wanted to discuss an adjustment of their fees.

As to mitigating factors, "the existence of mitigating factors tends to lessen or reduce the sanction an attorney may face." *Smith-Scott*, 469 Md. at 365 (footnote omitted) (quoting *Sanderson,* 465 Md. at 70). Here, the hearing judge found that there were no mitigating factors. Mr. Moawad asserts that the hearing judge erred by failing to consider that he has never been the subject of any prior disciplinary action. However, while it is accurate that Mr. Moawad has never been the subject of a prior disciplinary action in Maryland, he was previously suspended from the Virginia Bar in 2019 for failure to comply with a subpoena.

60

Finally, this Court has consistently held that only if there exists "compelling extenuating circumstances justifying a lesser sanction," "will [this Court] even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct[.]" *Vanderlinde*, 364 Md. at 413, 414 (quoting *Attorney Grievance Comm'n v. Tomaino*, 362 Md. 483, 498 (2001)). Here, there are no such compelling extenuating circumstances. Thus, given Mr. Moawad's persistent misrepresentations to Bar Counsel, as well as his repeated attempts to cast blame on his business partner and other attorneys at his firm, the only appropriate sanction for Mr. Moawad is disbarment.

## CONCLUSION

Based on our thorough assessment of Mr. Moawad's misconduct, the existence of aggravating factors, and the absence of any mitigating factors, this Court agrees with Bar Counsel that disbarment is the only appropriate sanction. For the above reasons, we disbar Mr. Moawad.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST EDWARD EMAD MOAWAD.**